# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Thomas Boland, on behalf of himself and others similarly situated, | ) ) ) | 3:09-1335-SB |
| Plaintiff, | ) ) | |
| vs. | ) ) | **COMPLAINT** (Jury Trial Demanded) |
| Consolidated Multiple Listing Service, Inc. and John Does 1-8, | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>INTRODUCTION</u>

Thomas Boland, on behalf of himself and other purchasers of real-estate-brokerage services listed by John Does 1-8 on the Consolidated Multiple Listing Service, Inc. ("MLS"), brings this action to obtain relief for defendants' violations of the Sherman Act and for unjust enrichment under South Carolina law. Defendants unlawfully restrained competition among real-estate brokers in Columbia, South Carolina and the surrounding counties that comprise the Columbia MLS (the "MLS Service Area") by enacting and enforcing unlawful rules, regulations, by-laws, policies, and procedures that caused plaintiff and the class members to pay higher prices for real-estate-brokerage services (i.e., real-estate-brokerage commissions and any other fees charged) than they would have paid absent defendants' unlawful conduct more specifically described below.

## PARTIES

1.      Plaintiff, Thomas Boland, is a citizen of South Carolina, residing in this judicial district.  Boland listed real estate for sale at least 120 days before the date on which this Complaint was filed.

2.      Defendant Consolidated Multiple Listing Service of Columbia, Inc. is a South Carolina corporation with its principal place of business in Columbia, South Carolina.

3.      Defendants John Does 1-8 are licensed real-estate brokers and professionals doing business in the MLS Service Area, and MLS is a joint venture among John Does 1-8.  Upon information and belief, John Does 1-8 comprise MLS's Board of Directors and/or Executive Committee and have the right and power to direct and control the manner by which MLS operates and the manner in which John Doe 1-8's employees and/or agents provide information and real-estate-brokerage services to Plaintiff and the class members.

4       Although MLS also serves several counties surrounding Columbia, close to 100% of its listed properties—as measured by dollar volume of closed transactions—are located in Columbia, which is served by no other multi-listing service.  MLS is thus a marketwide joint venture of supposed competitors that possesses substantial market power, and to compete successfully a brokerage must be an MLS member.

## JURISDICTION AND VENUE

5.      Defendants' acts or omissions occurred in this judicial district.

6.      Because this matter arises under the Sherman Act, 15 U.S.C. §1, *et seq.*, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1331.

7.      This Court has personal jurisdiction over defendants because plaintiff and the class members' properties are located within this judicial district; Plaintiff and the class

members' causes of action accrued within this judicial district; and defendants do business

within this judicial district.

8.     Venue is appropriate in this Court because the defendants' principal place of

business is in the MLS Service Area, which encompasses this judicial district.

## FACTUAL ALLEGATIONS

**A.     Background on MLS**

9.     MLS is an entity to which John Does 1-8 and other member brokerages belong

and pay periodic dues.  In exchange for these dues, MLS provides John Does 1-8 and its other

member brokerages access to an electronic database of supply, pricing, and property-

characteristics information relating to past and current real-estate listings in the MLS Service

Area.

10.     MLS's database allows its members, including John Does 1-8, to communicate

information among themselves, such as descriptions of listed properties and offers to compensate

other members if these other members locate buyers for the listing agent or broker.  The database

also allows members representing buyers to search the listed properties to match buyers' needs.

11.     By providing an efficient means of exchanging information on real-estate listings,

MLS is intended to benefit real-estate buyers and sellers and, in turn, buyers of real-estate-

brokerage services in the MLS Service Area.  And since virtually all for-sale properties in the

MLS Service Area are listed on MLS, in order to appreciate availability; recognize property

characteristics; and understand real-estate prices, buyers' agents must use MLS when assisting

buyers in making a purchase decision.

12.     This role makes access to the MLS database—and therefore MLS membership—

critically important for any broker seeking to serve clients efficiently in the MLS Service Area.

Indeed, access to the MLS database is critical to being a successful MLS Service Area broker, as MLS is the only provider of this service in the MLS Service Area. Therefore, brokers seeking to provide meaningful real-estate-brokerage services in this area must be MLS members.

13.     MLS and John Does 1-8 (who comprise MLS's Board of Directors and/or Executive Committee) have adopted rules that govern MLS members' conduct and business practices and have set standards for admitting new members. Through these rules, defendants have profited by illegally inhibiting competition over the method by which they provide real-estate-brokerage services to customers (i.e., property sellers) in the MLS Service Area and have illegally stabilized the prices these customers pay for real-estate-brokerage services.

14.     For example, defendant-imposed MLS rules prevent members from providing a set of real-estate services that includes less than the full array of services that brokers traditionally have provided—even if a customer prefers to save money by purchasing less than all the services a broker offers. Additionally, defendant-imposed MLS rules require members to use a standard, pre-approved contract that, among other things, prevents its members from offering to a property seller the option of avoiding paying the broker a commission if the seller finds the buyer on his or her own.

15.     But perhaps most egregious, and certainly most germane to Plaintiff's Complaint, MLS rules impose unreasonable and objective criteria for membership and contain subjective standards for admission to membership that *allow MLS representatives to deny membership to brokers who they might expect to compete more aggressively or in more innovative ways than MLS members would prefer.* Instead, MLS representatives exclude innovative brokers or otherwise deter them from seeking MLS membership.

4

16.    Taken together, MLS rules limit competition among brokers; artificially stabilize the price of real-estate-brokerage services; and deter innovation and the emergence of new brokerage business models.  By adopting and enforcing the foregoing MLS rules, defendants violated and continue to violate federal and South Carolina law.

**B.    Relevant market**

17.    The market for real-estate-brokerage services constitutes the relevant market in this matter.

18.    Most real-estate sellers prefer to work with a broker or agent familiar with local market conditions.  For this reason, the real-estate-brokerage business is necessarily local in nature, and the relevant geographic markets in which brokerages compete are normally no larger than the service area of the multi-listing service in which the brokerages participate.

**C.    Concerted action by defendants**

19.    MLS is a combination or conspiracy among its members who are, upon information and belief, John Does 1-8—brokers and/or brokerages that supposedly compete with each other in the MLS Service Area.  And while a multi-listing service, like other joint ventures with market power, can have reasonable membership restrictions related to a legitimate, pro-competitive purpose, it can't create rules that unreasonably impede competition among brokerages and harm consumers.  *See United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1371 (5th Cir. 1980) ("[W]here a broker is excluded from a multiple listing service with the requisite market power without an adequate justification in the competitive needs of the service, both the broker and the public are clearly harmed.").

20.    Defendants—among John Does 1-8 and/or through John Does 1-8's participation on the MLS Board of Directors and/or Executive Committee—agreed to, adopt, maintain, and

enforce rules affecting the way MLS members provided real-estate-brokerage services; participated in MLS; and gained access to MLS services, including critical access to the MLS database. Accordingly, MLS rules were the result of agreements and concerted action among defendants to restrain competition and adversely affect plaintiff and the class members.

**D.    Defendants' illegal conduct**

*1.    The real-estate industry and defendants' market power in the MLS Service Area*

21.    Most all real-estate sellers and buyers hire a broker, and brokers in the MLS Service Area compete with each other to provide real-estate-brokerage services to customers. In fact, according to a national survey by the National Association of Realtors, which had 7,800 respondents located through county deed records, 87% of all home sellers use a broker.

22.    MLS is the only multiple-listing service for the MLS Service Area, and, upon information and belief, brokerages generally believe it would amount to economic suicide for them to leave MLS. Among other services, MLS provides its members the pooling and dissemination of information on virtually all properties available for sale in the MLS Service Area.

23.    MLS combines its members' real-estate-listings information into an electronic database and makes this data available to all MLS-member brokers.

24.    By listing information about a property for sale with MLS, a broker can market the property efficiently to a large number of potential buyers.

25.    A broker representing a buyer likewise can search the MLS database to provide the buyer with information about virtually all properties for sale in the MLS Service Area.

26.    MLS members use the database to, among other things, communicate to other MLS members the listing information relating to real estate they have for sale; offer to

compensate other members as cooperating brokers if these cooperating brokers locate buyers for the selling broker's listings; and locate real estate for prospective buyers.

27.     MLS also provides records of sold real estate that brokers use when working with sellers to set a property's listing price and to decide what offers to accept.  Brokers representing buyers likewise use sales data to help their customers.  Agents enlisted by property buyers to assist in purchasing a property often present options drawn exclusively from properties listed in the MLS, which listings describe supply to buyers' agents; appropriate properties for their buyer-clients; and allow buyers' agents to make appropriate offers.

28.     Not surprisingly, then, access to MLS is critical for brokers who wish to serve buyers or sellers successfully in the MLS Service Area, and MLS members account for virtually all the real-estate-brokerage services provided to property buyers and sellers in the MLS Service Area.  Accordingly, MLS has market power in the market for real-estate-brokerage services in the MLS Service Area.

**2.     *The growth of alternative-brokerage models***

29.     The prices customers pay to brokers for the real-estate-brokerage services associated with a typical real-estate sales transaction have increased substantially since 2003 in the MLS Service Area.  This is because brokers who adhere to traditional methods of doing business (like the MLS members) typically charge a fee calculated as a percentage of the property's sales price, and that percentage has tended to be relatively inflexible despite the fact that, on a historical average, property prices in the MLS Service Area have substantially increased.

30.     As a result of higher property prices in the MLS Service Area and elsewhere, innovative brokers offering competitively significant alternatives to traditional methods have

emerged in other areas of the country. *If defendants hadn't restricted these innovative brokers from competing in the MLS Service Area, these brokers would have provided MLS Service Area customers of real-estate-brokerage services with competitive options and, in the process, placed downward pressure on the prices charged by brokers (i.e., John Does 1-8) offering traditional methods of providing real-estate-brokerage services.*

31.    But during the class period, defendants did *not* let these other brokers compete in the MLS Service Area. Rather, MLS rules forbade these innovative brokers from joining MLS—and necessarily gaining access to MLS listings database, which would have allowed them to compete effectively with the real-estate-brokers who were MLS members—and, as such, defendants unreasonably restricted competition in the MLS Service Area, thereby depriving options and competitive pricing to customers in favor of artificially high, anti-competitive prices.

32.    ***Technology-savvy brokers.*** Some brokers in other markets use technology to automate certain tasks and to communicate more efficiently with customers. For example, technology allows brokers to contact, communicate with, and service customers remotely or in-person without the need for a retail office location. Such technology-savvy brokers reduce real-estate-brokerage costs by operating fewer or no physical offices and compete by passing cost savings on to customers through reduced real-estate-brokerage fees.

33.    ***Fee-For-Service models***. Some brokers outside the MLS Service Area contract with sellers and buyers to provide a subset of real-estate-brokerage services charging only for the services that customers wish to purchase. Many of these brokers offer their services for a flat fee rather than a percentage of the property's sale price, and typically these brokers' fees are lower than what traditional brokers (i.e., John Does 1-8) charge.

34.    One popular service offered by Fee-For-Service brokers outside the MLS Service Area is known as an "MLS listing only," whereby a broker, in exchange for a fee, lists a property on a multiple-listing-service database while allowing the seller to handle all other aspects of the transaction.

35.    Another Fee-For-Service package available outside of the MLS Service Area involves the broker handling all aspects of the transaction, except for attending the closing.  This option attracts sellers who'd like to perform all the closing services themselves or who have retained separate assistance with the closing (like using their lawyer) and would prefer to avoid paying a broker to attend.  Through such packages, buyers and sellers can save money by purchasing only the services they want their broker to provide.

36.    ***Price discounters and publicly owned brokerages.***  Brokers in other markets attract customers by offering full-service, reduced-commission real-estate-brokerage services. These brokers have sought a competitive advantage by creating nationwide firms that raise capital through public ownership, invest in nationwide brands, and provide real-estate-brokerage services to customers in multiple markets.  But these brokerage models haven't emerged in the MLS Service Area because of MLS rules banishing these brokerages from joining MLS and using its database.

37.    ***Exclusive-Agency listings.***  Outside the MLS Service Area, brokers also provide customers the opportunity to save money on commissions and fees by offering "Exclusive-Agency listings," which are agreements whereby the seller pays no commission or fee to his or her broker if the seller finds the buyer.

38.    While these and other competitively significant alternatives to the traditional method of providing real-estate-brokerage services exist for customers outside the MLS Service

9

Area, they don't exist in the MLS Service Area, as defendants' agreements and resulting actions have unreasonably restricted competition for real-estate-brokerage services there, which restrictions directly impacted and continue to directly impact plaintiff and the class members.

**E.    Defendants' agreement to restrain competition**

39.    The MLS rules to which defendant agreed harmed competition in multiple ways. As a result of these MLS rules, customers of real-estate-brokerage services in the MLS Service Area had fewer choices among types of brokers and paid higher fees for those services than customers in other areas of the country.  Defendants' MLS rules were not reasonably necessary to achieve the pro-competitive benefits of the MLS.  Instead, the MLS rules unreasonably (1) raised entry barriers for potential competitors by imposing burdensome prerequisites for membership; (2) provided a means of identifying potentially aggressive competitors so defendants could exclude them from MLS membership; (3) stabilized the price of real-estate-brokerage services through the prospect of price controls; (4) deterred the emergence of Internet-based brokerages; (5) stabilized the price of, and reduced customers options for, real-estate-brokerage services by dictating the services that all brokers in the MLS Service Area had to provide; and (6) discouraged entry of potential competitors who raised funds through public ownership.

40.    MLS rules prohibited its members from competing with one another by offering consumers the sort of fee-for-service brokerage options described above.  For example, MLS rules required that its members have "active involvement" in all aspects of the transaction, including "in the marketing, sale, and closing of the property."  (MLS By-laws, Art. IV; *see also* MLS Rule 1(a) (members must use MLS pre-approved contract that includes Article IV's "active involvement" language)) The rules also required that "[o]ffers on properties included in the MLS

shall be made in written form to the Selling Company and not directly to the Owner," thereby precluding brokers and home sellers in the MLS Service Area from entering into contracts where brokers would let the sellers handle offers in return for a reduced commission.  (MLS Rules, Rule 2)  These rules prohibited brokers and home sellers from negotiating brokerage service terms and consequently harmed consumers in the MLS Service Area because consumers had fewer brokerage service models from which to choose.

      41.     MLS rules also prohibited members from offering alternative contractual terms to consumers, such as the Exclusive Agency Listings contract described above, thus further stifling competition.  For instance, according to MLS rules, "[e]ach listing submitted by a Member shall be in writing on the Exclusive Right to Sell Form as approved by the Board from time to time. No alteration of any kind to the provisions of the Listing Agreement shall be allowed."  (MLS Rules, Rule 1(a))  This same rule forbade MLS members and consumers from "mak[ing] any agreement . . . which varies, in any way, the provisions of the Listing Agreement."  As such, this rule prevented brokers and home sellers in the MLS Service Area from agreeing to an Exclusive Agency Listing where the seller pays no commission or fee to his or her broker if the seller finds the buyer.  Consequently through MLS, John Does 1-8 stabilized the commissions and fees they collected at the expense of MLS Service Area consumers.

      42.     These examples are not exhaustive.  Other MLS rules had similar anticompetitive effects.  MLS rules, along with the need to be an MLS member in order to compete effectively in the MLS Service Area, allowed MLS-member brokers—primarily John Does 1-8—to prevent innovative or aggressive brokers from competing by denying them MLS membership and restricting the ways existing MLS Service Area brokers did business by disciplining existing

members who competed too aggressively or in a manner inconsistent with the wishes of John

Does 1-8.

43.    For example, MLS rules required that members be "primarily in the real estate

business within primary areas served by the MLS."  (MLS By-laws, Art. III, §1) MLS also

refused to admit brokers who didn't have a commercial offices in the Columbia Area.  (MLS

Rules, Rule 5(b))  These Rules excluded brokers located outside of the MLS Service Area or

who engaged primarily in a business other than real estate, even if these brokers were fully

licensed by South Carolina to serve as real-estate brokers.  Moreover, MLS provided its Board

and officers unfettered discretion to reject applicants for membership (MLS Rules, Rule 5(c)),

while simultaneously requiring potential competitors to provide information about their proposed

brokerage models and competitive histories.  (MLS By-laws, Art. III, §§6-7)

44.    In addition to maintaining unfettered discretion over membership decisions, MLS

imposed an excessive initial fee on new members, well above its costs of adding them to the

membership.  (MLS Rules, Rule 5(b))  MLS also maintained complete discretion to expel or

discipline members.  (MLS By-laws, Art. III, §4)

45.    Taken together, the MLS rules discouraged competition on price, and inhibited

competitive actions that would have altered the status quo.  As a result of defendants'

anticompetitive rules and conduct, customers of real-estate-brokerage services in the MLS

Service Area (i.e., plaintiff and the class members) had fewer choices of service options and paid

higher prices for real-estate-brokerage services than did customers in other parts of the country

and that these customers would have paid absent defendants' conspiracy and anticompetitive

conduct.

**F.    The Department of Justice's recent federal lawsuit against MLS and resulting stipulation**

46.    On May 2, 2008, the U.S. Department of Justice filed a complaint solely for equitable relief against MLS for violation of §1 of the Sherman Antitrust Act, seeking to enjoin MLS from enforcing the aforementioned rules because they restrained competition among real-estate brokers in the MLS Service Area to the detriment of John Doe 1-8's and other MLS-members' customers, namely, Plaintiff and the class members.  (Exhibit A.)

47.    On May 4, 2009, MLS and the DOJ stipulated to entry of a proposed final judgment. (Exhibit B)  The proposed final judgment, among other things, required MLS to change its membership rules so that low-priced and innovative real-estate brokers could compete in the MLS Service Area, which rules, according to the DOJ's May 4, 2009 press release (Exhibit C), "*caused consumers to pay more for residential real estate brokerage services in the Columbia Area*" (emphasis added).

48.    According to Christine Varney, Assistant Attorney General for the DOJ's Antitrust Division, the settlement "will remove unlawful impediments to competition for real estate brokerage services in the Columbia Area, and *will lead to more options and lower brokerage fees for South Carolina consumers*," (*id.* emphasis added)*,* since "access to the [MLS] database—and therefore MLS membership—is critical for any real-estate broker seeking to serve clients successfully in the MLS's service area . . . the rules adopted by the MLS governing who can be a member and how members must behave can have a significant impact on competition among real estate brokers in the area served by the MLS."  *Id.*

49.    The proposed final judgment enjoined and restrained MLS from adopting or enforcing any bylaw, rule, regulation, policy, or practice that had the purpose of effect of:

13

a.      Denying MLS membership in MLS to any broker who requests it;

b.      Discriminating against or disadvantaging any member or licensee based on office location, pricing or commission rates, business model, contractual forms or types used, or services or activities he or she performs or doesn't perform;

c.      Conditioning MLS's acceptance of any listing or provision of any other product or service to any member or any licensee on the his or her pricing or commission rate or performance of or agreement to perform any service or activity;

d.      Prohibiting, restricting, or impeding any truthful advertising or marketing activities of any home seller or discriminating against or disadvantaging any member or licensee for any truthful advertising or marketing activity;

e.      Requiring any broker who seeks to become a MLS member to pay—as a condition of becoming a member—initiation, application, or other fees that, individually or in the aggregate exceed the reasonably estimated cost incurred by MLS in adding a new member;

f.      Inquiring into or requesting information about the actual or anticipated business model, prices or commission rates charged or to be charged, or operations of (i) any broker who requests MLS membership, (ii) any member, or (iii) any licensee, except as necessary to ensure that the broker, member, or licensee holds (or employs a person who holds) the appropriate license under Title 40, Chapter 57 of the Code of Laws of South Carolina; and

g.      Adopting or enforcing any Rules or portions of Rules that MLS must delete under Sections V.A or V.B of the Final Judgment or reversing or modifying any modifications to Rules or portions of Rules that MLS must modify under Section V.B of the Final Judgment.

50.     The proposed final judgment also required MLS to delete and suspend multiple bylaws and rules.

51.     Furthermore, the proposed final judgment contained compliance and inspection provisions, including the requirement that within five business days after the date of entry of the final judgment, MLS had to:  (1) furnish all MLS members and licensees a hard or electronic copy of the Final Judgment and a hard or electronic copy of MLS's modified rules; (2) furnish a copy of the Final Judgment and a copy of MLS's modified rules to all people in the five years

14

preceding entry of the Final Judgment that MLS knows to have picked up an application for membership or who otherwise inquired about becoming an MLS member; and (3) notify everyone that MLS will allow any member who is not prohibited from membership to become a member.

52.    DOJ's lawsuit against MLS sought and obtained solely injunctive relief.

**G.    The DOJ's similar federal complaint and settlement with the Hilton Head MLS.**

53.    On October 16, 2007, the U.S. Department of Justice filed a complaint for equitable relief against Hilton Head MLS for violation of §1 of the Sherman Antitrust Act, seeking to enjoin HHMLS from enforcing similar rules because they restrained competition among real-estate brokers in the HHMLS Service Area to the detriment of the real-estate-broker defendants' customers.  (Exhibit D.)

54.    On September 17, 2007 (a month before the DOJ filed its complaint), HHMLS and the DOJ stipulated to entry of a proposed final judgment, which the parties filed on October 17, 2007.  (Exhibit E.)  The proposed final judgment, among other things, required HHMLS to change its membership rules so that low-priced and innovative real-estate brokers can compete in the HHMLS Service Area, which rules, according to the DOJ's October 16, 2007 press release, "*caused consumers to pay more for residential real estate brokerage services in the MLS Service Area.*"  (Exhibit F, emphasis added.)

55.    According to Thomas O. Barnett, Assistant Attorney General for the DOJ's Antitrust Division, the settlement "will remove impediments to competition for real-estate-brokerage services in the HHMLS Service Area, which *should lead to increased options and reduced brokerage fees for consumers*," *id.* (emphasis added)*, since "access to the [HH]MLS database—and therefore [HH]MLS membership—is critical for any real-estate broker seeking to

serve clients successfully in the [HH]MLS's service area." *Id.* "Consequently, the rules adopted

by the [HH]MLS governing who can be a member and how members must behave can have a

significant impact on competition among real estate brokers in the area served by the

[HH]MLS." *Id.*

56.     The proposed final judgment enjoined and restrained HHMLS from adopting or

enforcing any bylaw, rule, regulation, policy, or practice that has the purpose of effect of:

a.     Excluding from full membership any real-estate brokerage that has a broker-in-charge holding an active real estate broker license issued by the appropriate South Carolina governmental licensing authority or any appraisal firm owned by or employing at least one person with an active appraiser license issued by the appropriate South Carolina governmental licensing authority;

b.     Excluding from associate membership any licensee who holds an active real-estate broker, agent, or salesman license issued by the appropriate South Carolina governmental licensing authority;

c.     Failing to make available or furnish on like terms to any full HHMLS member any and all services that HHMLS now or hereafter makes available or furnishes to any of its full members;

d.     Failing to make available or furnish on like terms to any associate HHMLS member any and all services that HHMLS now or hereafter makes available or furnishes to any of its associate members;

e.     Failing to make available or furnish on like terms to any member who is an appraiser any and all services that HHMLS now or hereafter makes available or furnishes to any of its members who are appraisers;

f.     Discriminating against, disfavoring, disciplining, or expelling any full or associate HHMLS member based on its office location, corporate structure, level or type of compensation, scope of service, or method of service;

g.     Requiring any full or associate HHMLS member to perform real-estate-brokerage services in excess of those required by South Carolina law;

h.     Prescribing the terms of listing agreements, buyer's-representation agreements, or any other agreement between a full or associate HHMLS member and any client or any other person who is a prospective buyer or seller;

16

      i.      Refusing to accept or place in the HHMLS any HHMLS listing submitted by a full or associate HHMLS member;

      j.      Prescribing, recommending, setting standards, or guidelines concerning compensation;

      k.      Requiring an applicant or a full HHMLS member to inform HHMLS of the ownership interests that others have in such applicant or full HHMLS member or charging a fee for a change in ownership;

      l.      Requiring any full or associate HHMLS member, appraiser, or trustee to reside or have an office in the HHMLS service area or any particular area or location; or

      m.      Changing HHMLS three classes of membership (full, associate, and affiliate) without DOJ's prior approval.

57.      The proposed final judgment also requires HHMLS to delete and suspend multiple bylaws and rules.

58.      Furthermore, the proposed final judgment contains compliance and inspection provisions, including the requirement that within 60 days after the date of entry of the final judgment, HHMLS must:  (1) provide all of its members, trustees, and employees with notice of the amendments to its bylaws, rules, regulations, and policies to conform to the provisions of final judgment; (2) provide all of its members, trustees, and employees with a copy of the final judgment; (3) inform everyone that HHMLS knows to have inquired about membership in the last two years but who are not members of the amendments to HHMLS bylaws, rules, regulations, and policies to conform to the provisions of the final judgment; (4) inform all people and companies in active concert with HHMLS that they may apply or reapply for membership and that HHMLS will grant membership if the applicant meets the requirements of the bylaws, rules, regulations, and policies as revised by the final judgment; and (5) place on HHMLS's home page of its publicly accessible web site (currently, www.hiltonheadMLS.com) a notice of the final judgment with a link to the final judgment.

17

59.     DOJ's lawsuit against HHMLS sought and obtained solely injunctive relief.

**H.     The DOJ's similar federal complaint and settlement with the National Association of Realtors**

60.     On September 8, 2005, the DOJ sued the National Association of Realtors (Exhibit G), alleging NAR's nationwide rules violated §1 of the Sherman Act by obstructing innovative brokerages' use of Internet-based tools to provide real-estate services to customers and clients.  DOJ alleged that NAR's rules, which were similar to the MLS rules described above, limited competition from real-estate brokers using innovative business models and the Internet to offer better services to their customers.  NAR's rules allowed its traditional real-estate-broker members to direct that their clients' listings not be displayed on any non-traditional brokers' websites, such as "virtual-office-website brokers", thus, according to the DOJ's June 12, 2008 Competitive Impact Statement (Exhibit H), "restrain[ing] VOW-operating brokers from competing in a way that is efficient and desired by many customers. *Id.* at 6-7.

61.     DOJ's complaint charged that these rules restrained competition in that they prevented the benefits of innovation and competition from reaching consumers.  DOJ alleged that NAR's rules were the product of collective action by NAR's members and provided no pro-competitive benefit.  Specifically, by requiring NAR-affiliated multi-listing services to adopt rules that allowed real-estate brokers to withhold their clients' listings from VOWs and other non-traditional brokers by means of an "opt out," it enabled traditional real-estate brokers—like John Does 1-8—to block their competitors' customers from having full on-line access to various multi-listing services' listings.  And when exercised, the opt-out provision prevented non-traditional brokers from providing multi-listing-service listings that responded to customers' searches, thus effectively inhibiting new technology and restraining competition.

18

62.     DOJ alleged that the NAR's rules allowed traditional brokers to discriminate against non-traditional brokers based on these non-traditional brokers' business models, thus denying non-traditional brokers the full benefits of multi-listing-service participation.  As the result of NAR's policies, DOJ's lawsuit sought to enjoin traditional brokers from depriving customers the benefits that would flow from new forms of competition.

63.     On May 27, 2008, the DOJ and NAR signed a stipulation settling their lawsuit and proposing a final-judgment order.  (Exhibit I)   "[T]he settlement," said DOJ in its accompanying press release, "will enhance competition in the real estate brokerage industry, resulting in more choice, better service, and lower commission rates for consumers."  (Exhibit J)

64.     According to the proposed final-judgment order, NAR shall not adopt, maintain, or enforce any rule or enter into or enforce any agreement or practice, that directly or indirectly:

a.      Prohibits a broker from using a VOW or prohibits, restricts, or impedes a broker who uses a VOW from providing to customers on its VOW all of the listing information that a broker is permitted to provide to customers by hand, mail, facsimile, electronic mail, or any other methods of delivery;

b.      Unreasonably disadvantages or unreasonably discriminates against a broker in the use of a VOW to provide to customers all of the listing information that a broker is permitted to provide to customers by hand, mail, facsimile, electronic mail, or any other methods of delivery;

c.      Prohibits, restricts, or impedes the referral of customers whose identities are obtained from a VOW by a broker who uses a VOW to any other person, or establishes the price of any such referral;

d.      Imposes fees or costs upon any broker who operates a VOW or upon any person who operates a VOW for any broker that exceed the reasonably estimated actual costs incurred by a member board in providing listing information to the broker or person operating the VOW or in performing any other activities relating to the VOW, or discriminates in such VOW-related fees or costs between those imposed upon a broker who operates a VOW and those imposed upon a person who operates a VOW for a broker, unless the MLS (referring to multi-listing services,

19

generally) incurs greater costs in providing a service to a person who operates a VOW for a broker than it incurs in providing the same service to the broker; or

e.      Is inconsistent with the modified VOW Policy.

65.     According to DOJ's Competitive Impact Statement, the proposed final-judgment order "embodies the fundamental principle that an association of competing brokers, operating an MLS, cannot use the aggregated power of the MLS to discriminate against a particular method of competition (in this case VOWs).  The proposed Final Judgment will end the competitive harm resulting from NAR's Challenged Policies and will allow consumers to benefit from the enhanced competition that VOW brokers can provide."  Exhibit H at 8.

66.     The proposed final-judgment order contains multiple compliance and inspection provisions allowing, among other things:  (1) DOJ's access during NAR's office hours to inspect and copy, or at the option of the DOJ, to require NAR to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of NAR, relating to any matters contained in the court's eventual final judgment; and (2) DOJ's right to interview, either informally or on the record, NAR's officers, employees, or agents, who may have their individual counsel and counsel for NAR present, regarding matters relevant to DOJ's lawsuit.

67.     Like DOJ's lawsuit against MLS, its lawsuit against NAR sought and obtained solely injunctive relief.  In fact, the DOJ's Competitive Impact Statement explains that "[e]ntry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust action."  *Id.* at 9.

I.      **The Department of Justice and Federal Trade Commission's joint report condemning the real-estate industry for the practices alleged in this Complaint**

68.     In April 2007, the DOJ and FTC published a joint report titled "Competition in the Real Estate Brokerage Industry" (Exhibit K), which highlights anti-competitive practices in the real-estate industry.

69.     The report's introduction explains that, "[g]iven the size of the real estate industry, any restrains on competition in real estate brokerage will have significant adverse consequences for consumers." *Id.* at 1. The report also observes the advent of the Internet and the concomitant "increased demand for innovative, non-traditional real estate brokerage services." *Id.*

70.     But the report notes that "[w]hile there have been many positive developments in the residential real estate industry, there are some indications that consumers are not enjoying all of the possible benefits of competition in the real estate brokerage industry [and that certain broker] practices can lead to substantial consumer harm through deduced choice of real estate brokerage services, higher fees, and limitations on the ability to access information about real estate listings." *Id.* at 2.

71.     The report describes that in 2006, the FTC charged six multi-listing services—the Austin Board of Realtors; Information and Real Estate Services, LLC; Northern New England Real Estate Network, Inc.; Williamsburg Area Association of Realtors, Inc.; Realtors Association of Northeast Wisconsin, Inc.; and Monmouth County Association of Realtors, Inc.— with violating §5 of the FTC Act by adopting rules limiting the publication and marketing on the Internet of certain sellers' homes, but not others, based solely on the terms of their respective listings. The FTC obtained consent agreements with all six multi-listing services. *Id.* at 64.

21

72.     The FTC alleged that these six multi-listing services had implemented policies—like the defendants here—that prevented properties with non-traditional listing contracts from being displayed on a broad range of public real-estate websites and that these policies had the effect of discouraging brokers from using exclusive-agency listings, to the detriment of these non-traditional brokers' customers.  *Id.*

73.     Additionally, the report explains that in October 2006, the FTC charged two more multi-listing services—MiRealSource, Inc. and Realcomp II, Ltd.—with illegally restraining competition by, like here, limiting customers' ability to obtain low-cost real-estate-brokerage services.  The FTC's complaint against MiRealSource alleged that MiRealSource had adopted a set of rules to keep exclusive agency listings from being listed on its multi-listing service, as well as other rules that, again like here, restricted competition in real-estate-brokerage services.  This case resulted in a consent decree under which MiRealSource is prohibited from adopting or enforcing any rules or policies that deny or limit the ability of multi-listing-service members to enter into exclusive-agency listings, or any other lawful listing agreements, with home sellers.  *Id.* at 65.

74.     The FTC's complaint against Realcomp alleged that Realcomp had engaged in anticompetitive conduct by prohibiting information on exclusive-agency listings and other forms of non-traditional listings from being transmitted from the multi-listing service to public real-estate websites.  Both the MiRealSource and Realcomp complaints alleged that the companies' conduct was collusive and exclusionary because in agreeing to keep non-traditional listings off the multi-listing services or significant public websites MiRealSource and Realcomp were, in effect, agreeing with others or among themselves to limit the manner in which they competed and were withholding valuable benefits of the multi-listing services from real-estate brokers who

22

did not go along.  In particular, the FTC's goal in litigating its Realcomp case was to "prove that this group of competitors should be prohibited from engaging in such conduct to the detriment of consumers."  *Id.*

75.    The report later observes that despite DOJ's and FTC's enforcement activities, "new entrants who seek to compete in a different manner, and who have the potential to make the entire industry more competitive, would still face a significant obstacle inherent in the structure of the industry.  Namely, a broker's success typically depends on securing significant cooperation from direct competitors.  If that cooperation cannot be obtained, it is possible that an entrant might fail even if it is more efficient and provides a more attractive combination of price and service to consumers."  *Id.* at 66.  "This tendency away from competition," the report observed, "may be reinforced by boycotts or other discriminatory practices."  *Id.* at 67.

76.    As demonstrated, then, the facts described in the DOJ/FTC report, as well as the above-described DOJ lawsuits, confirm the real-estate industry's long history of anti-competitive behavior, all of which is directed toward the industry's customers and which anti-competitive behavior's latest iteration took the form of defendants' agreement to exclude innovative real-estate brokers from participating in MLS and from gaining important access to the MLS database, thus causing plaintiff and the class members to pay higher prices for real-estate-brokerage services.

77.    Finally, defendants' illegal scheme to prevent innovators from accessing MLS for the innovators' clients effectively foreclosed competition in the market for real-estate-brokerage services in the MLS Service Area.  Given the John Doe 1-8's near 100% MLS Service Area market share, innovators could not have realistically or effectively developed a rival MLS-like service as an alternative to the real-estate brokers' dominant multi-listing service.  Even had

23

they, property sellers would not have used this service, as accessing it would have doubled the

"search costs" involved in identifying property to purchase.  And because "search costs" are a

major component of transaction costs, by not allowing innovators access to MLS,

defendants effectively excluded innovators from the MLS Service Area market for real-estate-

brokerage services and inhibited competition in that market to the detriment of plaintiff and the

class members.

**J.**     **Effect on South Carolina and interstate commerce**

78.     John Does 1-8 provide real-estate-brokerage services to customers seeking to buy

or sell real estate in the MLS Service Area, and defendants' illegal activities affected customers

purchasing real-state services in the MLS Service Area.

79.     In 2005 alone, MLS-member real-estate brokerages facilitated the exchange of

property worth over $2 billion and collected fees of over $125 million for their services.

80.     Defendants' activities were in the flow of and had a substantial effect on South

Carolina and interstate commerce.

## CLASS-ACTION ALLEGATIONS

81.     Plaintiff brings this lawsuit on behalf of the following class under Rule 23(b)(3)

of the Federal Rules of Civil Procedure:

> All individuals or businesses that purchased John Doe 1-8's real-
> estate brokerage services in the MLS Service Area from May 20,
> 2005 through January 12, 2009

82.     Plaintiff is a class member.

83.     Plaintiff can identify all class members from defendants' own records and the

records.

24

84. Plaintiff does not know the exact size of the class since this information is in defendants' exclusive control. But based on the nature of the trade and commerce involved, plaintiff believes that the class numbers in the thousands and that the class members are dispersed throughout the MLS Service Area and beyond. Therefore, joinder of all class members would be impracticable, and class treatment is the superior method for fairly and efficiently adjudicating this controversy.

85. Plaintiff's claims are typical of other class members' claims because he was injured through defendants' uniform misconduct and paid a supra-competitive price for real-estate-brokerage services when selling his property without knowing that this commission was illegal and improper. Accordingly, by proving his own claims, plaintiff will presumptively prove the class members' claims.

86. Common legal and factual questions predominately exist within the class, including but not limited to the following:

    a. Whether defendants conspired to exclude innovative real-estate brokers from participating in MLS and from gaining important access to the MLS database;

    b. The existence and duration of defendants' horizontal agreement to exclude innovative real-estate brokers from participating in MLS and from gaining important access to the MLS database;

    c. Whether defendants participated in the arrangement, contract, or agreement to exclude innovative real-estate brokers from participating in MLS and from gaining important access to the MLS database;

    d. Whether defendants implemented their conspiracy to exclude innovative real-estate brokers from participating in MLS and from gaining important access to the MLS database;

    e. Whether defendants' conspiracy adversely affected class members by way of increasing the prices they paid for real-estate-brokerage services on account of innovative real-estate brokers' inability to compete in the MLS Service Area market;

f.    Whether plaintiff and the class members conferred a benefit upon defendants;

g.    Whether defendants received and retained plaintiff and the class members' benefits under such circumstances that it would be inequitable and unconscionable to permit defendants to retain these benefits without paying their reasonable value to plaintiff and the class members; and

h.    Whether defendants' conduct caused injury-in-fact to the business or property of plaintiff and the class members, and if so, the appropriate classwide measure of damages;

87.    Plaintiff can and will fairly and adequately represent and protect the class members' interests and have no interests that conflict with or are antagonistic to these class members' interests.  Moreover, plaintiff's attorneys are experienced and competent in complex, class-action and antitrust litigation.

88.    Class certification is appropriate because a class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted given that:

a.    Common questions of law and fact overwhelmingly predominate over any individual questions that exist within the class and, consequently, enormous economies to the Court and parties exist in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

b.    Each class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

c.    Class treatment is required for optimal deterrence and compensation and for limiting the Court-awarded, reasonable legal expenses incurred by class members; and

d.    Despite the relatively small size of each class member's claim, the aggregate volume of their claims, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable class counsel to litigate this case as a class action on a cost-effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class.

89.    Plaintiff's claims are typical of the class members' claims because defendants injured plaintiff and the class members in the same manner; namely, defendants forced them all to pay supra-competitive prices for real-estate-brokerage services.

## COUNT I
### (Violation of the Sherman Act, 15 U.S.C. §1, *et. seq*)

90.    During the class period, defendants engaged in an illegal contract, combination, or conspiracy with its members in restraint of trade or commerce. In particular, defendants to exclude innovative real-estate brokers from participating in MLS and from gaining important access to the MLS database in violation of Section 1 of the Sherman Act, 15 U.S.C.S. §1, *et seq.*

91.    Defendants' conspiracy allowed them to (a) fix, raise, maintain, and stabilize prices of real-estate-brokerage services charged to plaintiff and the class members, and (b) caused plaintiff and the class members to pay higher prices for real-estate-brokerage services for which they contracted with John Does 1-8 than they would have paid absent defendants' conspiracy.

92.    In formulating and effectuating their conspiracy, defendants met to discuss excluding, and agreed to exclude, innovative real-estate brokers from participating in MLS and from gaining important access to the MLS database, which agreement and exclusion allowed defendants to charge plaintiff and the class members supra-competitive prices for real-estate-brokerage services, as defendants intended.

93.    Defendants' conspiracy with its members had the following adverse effects:

a.    It restrained, suppressed, and eliminated price competition for real-estate-brokerage services in the MLS Service Area;

27

b.      It raised, fixed, maintained, and stabilized at artificially high levels prices for real-estate-brokerage services in the MLS Service Area;

c.      It deprived free and open market competition to plaintiff and the class members for purchase of real-estate-brokerage services in the MLS Service Area; and

d.      Plaintiff and the class members paid more than they otherwise would have for real-estate-brokerage services in the MLS Service Area.

94.      Defendants' conspiracy substantially affected trade or commerce in violation of the Sherman Act.

95.      As a direct and proximate result of defendants' illegal conduct, plaintiff and the class members were injured by paying more for real-estate-brokerage services than they would have paid absent defendants' conspiracy.

## COUNT II
### (Unjust Enrichment)

96.      As the result of defendants' illegal agreement, contract, combination, and conspiracy, plaintiff and the class members conferred benefits upon defendants either directly in the form of commission payments (in the case of John Does 1-8) or indirectly in the form of John Doe 1-8's membership dues (in the case of MLS).

97.       Defendants received and retained these benefits under such circumstances that it would be inequitable and unconscionable to permit defendants to retain them without paying their reasonable value to plaintiff and the class members.

98.      As a direct and proximate result of defendants' unjust enrichment, plaintiff and the class members suffered injury and seek an order directing defendants to return to them the amount they improperly paid to defendants, plus interest.

28

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

A.    That this Court determine this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure and certify plaintiff's proposed class;

B.    That this Court find that defendants' conspiracy violated the Sherman Act;

C.    That this Court find plaintiff unjustly enriched defendants;

D.    This Court enter an order awarding attorneys' fees and costs associated with investigating and prosecuting this action;

E.    That this Court enter an order awarding pre-judgment and post-judgment interest; and

F.    That this Court enter an order awarding all other relief deemed just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on their alleged claims.


Dated:  May 20, 2009                **McGOWAN, HOOD & FELDER, LLC**


By:    _____s/ John G. Felder, Jr._____
       John G. Felder, Jr. (State ID No. 7051)
       1517 Hampton Street
       Columbia, SC 29201
       Telephone:    (803) 779-0100
       Facsimile:    (803) 256-0702
       Email:        jfelder@mcgowanhood.com

       S. Randall Hood (State ID No. 065360)
       Chad McGowan (State ID No. 9943)
       **McGOWAN, HOOD & FELDER, LLC**
       1539 Healthcare Drive
       Rock Hill, SC  29732
       Telephone:    (803) 327-7800
       Facsimile:    (803) 328-5656
       Email:        rhood@mcgowanhood.com
                     cmcgowan@mcgowanhood.com

Jesse A. Kirchner (State ID No.70479)
Matthew E. Yelverton (State ID No. 69734)
**THURMOND KIRCHNER & TIMBES, P.A.**
15 Middle Atlantic Wharf, Suite 101
Charleston, SC 29401
Telephone:      (843) 937-8000
Facsimile:       (843) 937-4200
Email:            jkirchner@tktlawfirm.com
                       myelverton@tktlawfirm.com

Daniel R. Karon
**GOLDMAN SCARLATO & KARON, P.C.**
55 Public Square, Suite 1500
Cleveland, OH 44113
Telephone:      (216) 622-1851
Facsimile:       (216) 622-1852
Email:            karon@gsk-law.com

Mark Reinhardt
Garrett D. Blanchfield
**REINHARDT WENDORF & BLANCHFIELD**
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:      (651) 287-2100
Facsimile:       (651) 287-2103
Email:            m.reinhardt@rwblawfirm.com
                       g.blanchfield@rwblawfirm.com

Grant A. Goodman
**GOODMAN LAW FIRM**
1390 W 9th St., Suite 410
Cleveland, OH 44113
Telephone:      (216) 928-9990
Facsimile:       (216) 357-2679
Email:            ggoodlaw@yahoo.com

*Attorneys for plaintiff and the putative class*